T.C. Memo. 2009-212

UNITED STATES TAX COURT

ESTATE OF ROGER D. MALKIN, DECEASED, JONATHAN R. MALKIN AND
MELISSA MALKIN, EXECUTORS, ET AL.,[1] Petitioners $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 9222-05, 9252-05,    Filed September 16, 2009.
            9253-05, 9531-05.

        As part of his estate plan, D created two family
limited partnerships (FLPs) and four trusts.  D was the
general partner of each FLP; he and two trusts were the
limited partners of each FLP.  The beneficiaries of the
trusts were D's two children.  To the first FLP (MFLP), D
transferred stock.  To the second FLP (CRFLP), D transferred
stock and his interests in four LLCs.

        In the estate tax notice of deficiency, R
determined that the value of the property D transferred
to the FLPs should be brought back into the value of
the gross estate under either sec. 2035(a) or

_____

[1]Cases of the following petitioners are consolidated
herewith:  Estate of Roger D. Malkin, Donor, Deceased, Jonathan
R. Malkin and Melissa Malkin, Executors, docket Nos. 9252-05,
9253-05, and 9531-05.

2036(a)(1) or (2), I.R.C.  R also disallowed certain deductions.  In the gift tax notices of deficiency, R, viewing the facts somewhat differently, determined that the same transferred property should be taxed (in the alternative) as gifts to D's children.  R also determined that several transfers D made during the last 3 years of his life were gifts to his children.

1.  Held:  Because, within the meaning of sec. 2036(a)(1), I.R.C., D retained for his life the possession and enjoyment of the stock he transferred to the FLPs and did not transfer that stock in a bona fide sale for an adequate and full consideration in money or money's worth, the value of D's gross estate includes the value of that transferred stock.

2.  Held, further, D made indirect gifts to his children of interests in the LLCs when he transferred to the trusts limited partnership interests in CRFLP and transferred to CRFLP interests in the LLCs.

3.  Held, further, D made various direct and indirect gifts to his children in the last 3 years of his life.

4.  Held, further, five deductions of the estate are disallowed (one only in part) and, pursuant to sec. 2053(c)(2), I.R.C., all other deductions may not exceed the value of estate property subject to claims.


Harvey A. Strickon, Gerald J. Fields, and Edward L. Peck, for petitioners.

Lydia A. Branche, Shawna A. Early, and Frederick C. Mutter, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HALPERN, Judge:  By separate notices of deficiency (the notices), respondent determined a deficiency of $6,192,938 in the Federal estate tax of the Estate of Roger D. Malkin (the estate and decedent, respectively) and deficiencies in decedent's Federal gift taxes of $7,832,277, $232,247, and $3,434,163 for 1998, 1999, and 2000, respectively.

Decedent created two family limited partnerships (FLPs) and four trusts.  Decedent was the general partner of each FLP; he and two trusts were the limited partners of each FLP.  The beneficiaries of the trusts were decedent's two children, Jonathan R. Malkin (Jonathan Malkin) and Melissa Malkin.  To the first limited partnership, the Roger D. Malkin Family Limited Partnership (MFLP), decedent transferred stock.  To the second, the Cotton Row Family Limited Partnership (CRFLP), decedent transferred stock and his interests in four limited liability companies (LLCs), which he controlled with his son, all called "Malkin & Company, LLC", and, after the first, denominated by roman numerals, e.g., "Malkin & Company IV, LLC".  We refer to those LLCs individually as Malkin I, Malkin II, etc., and together as the Malkin LLCs.[2]

---

[2]Although decedent and his son controlled five LLCs called Malkin & Co., decedent transferred to CRFLP his interests in only four of them.  See infra.

Unless otherwise stated, section references are to the Internal Revenue Code in effect for the date of decedent's death and for the years in issue and Rule references are to the Tax Court Rules of Practice and Procedure. We round all dollar amounts to the nearest dollar.

After concessions,[3] and taking into account our disposition of certain issues, the issues for decision are as follows:

(1) Within the meaning of section 2036(a)(1), whether decedent retained for his life the possession or enjoyment of, or the right to the income from, the property he transferred to the FLPs; if so, whether decedent nonetheless transferred that property in a bona fide sale for an adequate and full consideration in money or money's worth;

(2) in the alternative, in 1998 and 2000, whether decedent made a taxable gift to his children when he transferred property to the FLPs and transferred limited partnership interests in those entities to his children's trusts;

(3) in 1998, whether decedent made a taxable gift to Jonathan Malkin when he paid a $64,760 debt of Malkin I;

(4) in 2000, whether decedent made taxable gifts to his children when he paid a $3,878,409 debt of Malkin I;

_____

[3]Regarding the estate tax notice, respondent concedes that petitioners properly valued certain stock and options decedent held at his death; petitioners concede that respondent properly valued certain stock decedent held at his death and properly included two bank accounts in his determination of decedent's gross estate. Regarding the 1998 and 2000 gift tax notices, the parties agree that certain cash transfers decedent made to the trusts were gifts. Regarding the 1998 and 1999 gift tax notices, petitioners offer no evidence or argument that decedent was entitled to a $20,000 (as opposed to $10,000) annual gift tax exclusion. We take petitioners' silence as their concession.

(5) in 2000, whether decedent made taxable gifts to his children when, with respect to Malkin IV, he paid a $370,061 debt, made a $177,795 capital contribution, and assigned a promissory note worth approximately $1 million;

(6) in 1998, 1999, and 2000, whether decedent made taxable gifts to Melissa Malkin when he transferred to her $68,000, $149,000, and $100,000, respectively;

(7) in 2000, whether decedent made a taxable gift to Jonathan Malkin when he transferred to him $830,000; and

(8) whether the estate is entitled to deductions claimed on Form 706, United States Estate (and Generation-Skipping Transfer) Tax Return, Schedule J, Schedule K, and Schedule O of $1,952,045, $16,085,376, and $230,925, respectively.

Petitioners bear the burden of proof. See Rule 142(a). Petitioners have not raised the issue of section 7491(a), which shifts the burden of proof to the Commissioner in certain situations. We conclude that section 7491(a) does not apply here because petitioners have not produced any evidence that establishes the preconditions for its application.

FINDINGS OF FACT[4]

Some facts have been stipulated and are so found. The stipulation of facts, with accompanying exhibits, is incorporated herein by this reference. At his death, decedent resided in Mississippi. When the petitions were filed, Jonathan Malkin resided in Connecticut and Melissa Malkin resided in Virginia.

Background

Decedent died on November 22, 2000. From 1980 until his death, decedent served as the chairman and chief executive officer of Delta & Pine Land Co. (D&PL). During the course of his employment with D&PL, decedent acquired more than 1 million D&PL shares and options.

Formation and Funding of MFLP, JRM Trust I, and MM Trust I

In 1997, decedent asked his tax return preparer and financial planner, Richard Moriarty (Mr. Moriarty) of the accounting firm Arthur Andersen LLP (Andersen), to assist with his estate planning. Specifically, decedent wanted to transfer some D&PL shares (worth more than $16 million) to his children,

[4]Pursuant to Rule 151(e)(3), each party, in its answering brief, must "set forth any objections, together with the reasons therefor, to any proposed findings of any other party". Petitioners have filed an answering brief, but they have failed to set forth objections to respondent's proposed findings of fact. Accordingly, we must conclude that petitioners have conceded that respondent's proposed findings of fact are correct except to the extent that those findings are clearly inconsistent with either evidence in the record or petitioners' proposed findings of fact. See, e.g., Jonson v. Commissioner, 118 T.C. 106, 108 n.4 (2002), affd. 353 F.3d 1181 (10th Cir. 2003).

but he did not want them to sell those shares. Mr. Moriarty, not being an expert in estate planning, introduced decedent to his colleague at Andersen, Charles Ogeka (Mr. Ogeka). Decedent, Mr. Moriarty, and Mr. Ogeka, in addition to decedent's attorneys, Jerome C. Hafter (Mr. Hafter), longtime counsel to D&PL, and Marian S. Alexander (Ms. Alexander), had a series of conference calls to discuss decedent's estate plan. In the end, decedent decided to form an FLP to hold the D&PL shares, and two trusts, one for each of his children, to hold limited partnership interests in the FLP.

In 1998, Ms. Alexander organized MFLP and the two trusts; i.e., the Jonathan R. Malkin Irrevocable Trust (JRM Trust I) and the Melissa Malkin Irrevocable Trust (MM Trust I; with JRM Trust I, the MFLP trusts). In June 1998, decedent executed documents establishing JRM Trust I and MM Trust I. Mr. Hafter and Ms. Alexander were the original trustees of both trusts, and they served as trustees until shortly after decedent's death. Each trust had its own bank account.

In August 1998, an unidentified source deposited $25,000 in the bank account of each MFLP trust. Each trust then issued its respective beneficiary a $25,000 demand promissory note payable to that beneficiary. A few days later, decedent made gifts of $500,000 to both trusts.

On August 31, 1998, the following occurred.  A Certificate of Mississippi Limited Partnership was filed on behalf of MFLP with the Mississippi secretary of state.  MFLP had 100,000 partnership units: 1,000 general partnership units and 99,000 limited partnership units.  Decedent transferred 365,371 D&PL shares worth $16,782,120 to MFLP for 1,000 general partnership units and 98,494 limited partnership units.  The trustees of each MFLP trust transferred $25,000 to MFLP for 253 limited partnership units.  The trustees of each trust then entered into a contract with decedent for the purchase of 44,297 limited partnership units for $442,424 in cash and a 9-year, $3,981,816 self-canceling installment note (SCIN) with interest of 7.14 percent.[5]  The trustees executed the SCINs and transferred the cash to decedent, and he assigned the limited partnership interests to the trustees.  The trustees executed security agreements granting decedent a security interest in the limited partnership interests.

Interest Payments From the MFLP Trusts to Decedent

On August 31, 1999, JRM Trust I and MM Trust I both owed decedent a $284,302 interest payment on their respective SCINs.  On November 19, 1999, both trusts transferred $50,000 to an

---

[5]An SCIN is a "debt obligation that is automatically extinguished at the creditor's death. * * * Any remaining balance on the note becomes uncollectible.  Self-canceling notes are typically used in estate planning."  Black's Law Dictionary 1163 (9th ed. 2009).

unidentified source.  On March 9, 2000, an unidentified source wired $289,000 to decedent.  The trustees of MM Trust I issued Melissa Malkin a $289,000 demand promissory note, dated March 10, 2000, payable to her.  On March 13, 2000, decedent wired $289,000 to Jonathan Malkin.  The trustees of JRM Trust I issued Jonathan Malkin a $289,000 demand promissory note, dated March 17, 2000, payable to him.  On March 21, 2000, an unidentified source wired $289,000 to decedent.

On August 31, 2000, JRM Trust I and MM Trust I both owed decedent a $284,302 interest payment on their respective SCINs. On that day, the trustees of JRM Trust I issued a $284,302 demand promissory note to Jonathan Malkin, payable to him, and the trustees of MM Trust I issued a like note to Melissa Malkin, payable to her.  On September 1, 2000, decedent transferred $44,718 to the trustees of MM Trust I and $44,574 to the trustees of JRM Trust I, and $284,292 to both Jonathan Malkin and Melissa Malkin.  On the same day, both Jonathan Malkin and Melissa Malkin transferred $284,292 to their respective trusts.  Also on that day, the trustees of JRM Trust I issued Jonathan Malkin a $52,813 check and the trustees of MM Trust I issued Melissa Malkin a $52,793 check.  On September 5, 2000, two $284,302 checks dated August 31, 2000, and payable to decedent from the MFLP trusts were debited from the trusts' respective bank accounts.

Decedent's Pledging of MFLP Assets

On September 24, 1999, decedent and the trustees of the MFLP trusts authorized decedent to pledge MFLP assets, without limitation, to secure his personal debt to Bank of America (the first resolution). That day, decedent pledged to Bank of America 365,000 of the 365,371 D&PL shares MFLP held. On December 7, 1999, to support the first resolution, decedent executed a personal guaranty (the first guaranty) promising to use his "personal assets" to repay his debt, plus interest. The first guaranty states that decedent agrees to pay MFLP a fee of $32,587, 0.75 percent of the $4,345,000 required as security for his debt. On April 19, 2000, decedent and the trustees authorized decedent to repledge MFLP assets, without limitation, to secure his personal debt to Morgan Guaranty Trust Co. of New York (the second resolution and Morgan Guaranty, respectively). That day, decedent repledged the 365,000 D&PL shares to Morgan Guaranty; on June 19, 2000, decedent pledged to Morgan Guaranty the remaining 371 D&PL shares MFLP held. On April 22, 2000, to support the second resolution, decedent executed a second personal guaranty (the second guaranty) again promising to use his "personal assets" to repay his debt, plus interest. The second guaranty does not state a dollar amount for a fee. On September 1, 2000, decedent transferred $39,140 to MFLP.

The Malkin LLCs

Decedent and his son were the initial members of the Malkin LLCs. Their ownership interests in the Malkin LLCs, as reported for tax purposes, were as follows.

| Entity | Decedent | Jonathan Malkin | Other |
|--------|----------|-----------------|-------|
| Malkin I | 30.00% | 70.00% | -- |
| Malkin II | 46.25 | 46.25 | 7.5% |
| Malkin III | 0.02 | 99.98 | -- |
| Malkin IV | 99.98 | 0.02 | -- |
| Malkin V | 47.50 | 47.50 | 5.0 |

Malkin III and Malkin IV were the capital members of a partnership decedent and his son controlled. Malkin I owned 43.33 percent of the general partner of that partnership. Malkin II and Malkin V each had a single $500,000 investment in two different private equity ventures.

Decedent's Diagnosis

In May 1999, decedent was diagnosed with pancreatic cancer. Several months later, decedent decided to create another FLP to hold his interests in the Malkin LLCs and another two trusts for his children to hold limited partnership interests in that second FLP.

Formation and Funding of CRFLP, JRM Trust II, and MM Trust II

Ms. Alexander organized CRFLP and the two trusts, i.e., J.R.M. Irrevocable Trust (JRM Trust II) and M.M. Irrevocable Trust (MM Trust II; with JRM Trust II, the CRFLP trusts). In

November 1999, a Certificate of Mississippi Limited Partnership was filed on behalf of CRFLP with the Mississippi secretary of state.  CRFLP had 100,000 partnership units: 1,000 general partnership units and 99,000 limited partnership units.  On February 29, 2000, in exchange for all 100,000 CRFLP partnership units, decedent transferred to CRFLP a 30-percent interest in Malkin I, a 50-percent interest in Malkin II, a 99-percent interest in Malkin IV, and a 50-percent interest in Malkin V.[6] On the same day, decedent executed an agreement purporting to assign 44,500 CRFLP limited partnership interests to each CRFLP trust.

On March 1, 2000, decedent executed documents establishing the CRFLP trusts.  Mr. Hafter and Ms. Alexander were the original trustees of both trusts, and they served as trustees until shortly after decedent's death.  Each trust had its own bank account.  The trustees of both trusts entered into contracts with decedent for the purchase of 44,500 CRFLP limited partnership units for $400,500.  The terms of the contract for MM Trust II provided for a 10-percent downpayment of $40,050 and a 9-year, $360,450 promissory note with interest of 6.8 percent.  The terms of the contract for JRM Trust II provided for a 10-percent

---

[6]We note that decedent transferred percentage interests in the Malkin LLCs different from those he had reported for tax purposes.  The parties, however, stipulated both sets of numbers and do not discuss the discrepancy.  We follow their stipulation.

downpayment of $40,500 and a 9-year, $360,000 promissory note with interest of approximately 6.8 percent. About a week after the signing of the contracts, decedent transferred $40,525 to each CRFLP trust. Two days after those transfers, each trust transferred $40,500 to decedent as the 10-percent downpayment for the CRFLP limited partnership units.[7] The trustees also executed the promissory notes for the remainder of the purchase price. The trustees executed security agreements granting decedent a security interest in the limited partnership interests.

In November 2000, decedent transferred 80,000 D&PL shares to CRFLP. Before transferring the shares, decedent had pledged them as collateral for a personal loan from Morgan Guaranty, and the shares remained as collateral after the transfer.

The CRFLP trustees never paid interest on the promissory notes; decedent died before the first payment became due, and the estate never made any demand.

MFLP and CRFLP constituted decedent's entire estate plan for transferring wealth to his two children. Decedent, by his will, left nothing to them, and his estate was insolvent.

---

[7]We note the $450 discrepancy between the $40,050 downpayment MM Trust II owed according to its contract and the $40,500 it in fact paid.

Decedent's 1998 Transfers

In November, decedent paid a $64,760 debt of Malkin I. Throughout the year, decedent transferred $68,000 to Melissa Malkin.

Decedent's 1999 Transfers

Throughout the year, decedent transferred $149,000 to Melissa Malkin.

Decedent's 2000 Transfers

In May, decedent paid a $3,878,409 debt of Malkin I and a $370,061 debt of Malkin IV. Decedent also assigned to Malkin IV his interest in a promissory note worth approximately $1 million. In September, decedent paid $177,795 to Malkin IV related to a capital call.

In June, decedent transferred to Jonathan Malkin $730,000 in exchange for a promissory note for that amount. In November, decedent wired Jonathan Malkin and Melissa Malkin both $100,000 in exchange for a promissory note from each for that amount.

Deductions of the Estate

On March 1, 2002, decedent's executors filed Form 706, on which they claimed deductions of $1,961,766 for Schedule J administration expenses,[8] $16,085,376 for Schedule K debts of decedent, and $230,925 for a Schedule O charitable contribution,

_____

[8]Respondent has allowed the $9,721 deduction for funeral expenses. He has disallowed all other Schedule J deductions.

for a total of Schedule J, K, and O deductions of $18,278,067. The two largest claims among the Schedule K debts are a $12,936,886 loan secured by D&PL stock worth $10,475,066 and a $2,346,724 obligation to Malkin IV.

The Form 706 reported assets worth $15,458,411 available to satisfy decedent's debts. In addition, the estate includes funds from two accounts not reported on Schedule C worth $1,198,148 and $51,038.

OPINION

I. Introduction

As part of his estate plan, decedent created two FLPs and four trusts. Decedent was the general partner of each FLP; he and two trusts were the limited partners of each FLP. The beneficiaries of the trusts were decedent's two children. To the first limited partnership, MFLP, decedent transferred stock. To the second, CRFLP, decedent transferred stock and his interests in four LLCs, which he controlled with his son.

In the estate tax notice, respondent determined that the value of property decedent transferred to the FLPs should be brought back into the value of the gross estate under either section 2035(a) or section 2036(a)(1) or (2). He also disallowed certain deductions. In the gift tax notices, respondent, viewing the facts somewhat differently, determined that the same transferred property should be taxed (in the alternative) as

gifts to Jonathan Malkin and Melissa Malkin.  Respondent also determined that several transfers decedent made during the last 3 years of his life were gifts.

## II.  Inclusion in the Gross Estate: Section 2036(a)

### A.  Burden of Proof

We have decided supra that petitioners bear the burden of proof.  As stated in Estate of Reichardt v. Commissioner, 114 T.C. 144, 151 (2000), in the context of transactions involving family members, that burden is "especially onerous".

### B.  General Rules

Section 2001(a) imposes a tax "on the transfer of the taxable estate of every decedent who is a citizen or resident of the United States", and section 2051 defines the taxable estate as "the value of the gross estate", less applicable deductions.  Section 2031(a) specifies that the value of the gross estate comprises the values of "all property, real or personal, tangible or intangible, wherever situated", to the extent provided in sections 2033 through 2046.  Section 2033 broadly provides that the "value of the gross estate shall include the value of all property to the extent of the interest therein of the decedent at the time of his death."  Sections 2034 through 2045 then explicitly mandate inclusion of several more narrowly defined classes of assets.  Section 2036(a) provides the following:

SEC. 2036.   TRANSFERS WITH RETAINED LIFE ESTATE.

     (a) General Rule.--The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death--

          (1) the possession or enjoyment of, or the right to the income from, the property, or

          (2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom.

C.   MFLP, CRFLP, and Section 2036(a)(1)

     1.   Respondent's Argument

"For purposes of section 2036(a), a transferor retains the enjoyment of property if there is an express or implied agreement at the time of the transfer that the transferor will retain the present economic benefits of the property, even if the retained right is not legally enforceable."  Estate of Reichardt v. Commissioner, supra at 151.  Respondent contends that both an express and an implied agreement existed between decedent and the trustees of the MFLP and CRFLP trusts that decedent would retain the present economic benefits of the property decedent transferred to MFLP and CRFLP.  According to respondent, the "actual use of all * * * MFLP's and CRFLP's assets to secure and

collateralize decedent's pre- and post-death financial obligations belies the claim that no such understanding existed."

### 2. Petitioners' Argument

Petitioners deny that any express or implied agreement allowed decedent to retain the present economic benefits of the property he transferred to the FLPs. As to MFLP, petitioners assert that its partners, i.e., decedent, the general partner, and Mr. Hafter and Ms. Alexander, trustees for the limited partners, approved both resolutions pledging the D&PL shares. Even though the shares served as collateral for personal loans to decedent, to support each resolution decedent signed a guaranty that he would use his "personal assets" to repay his debt, plus interest. Petitioners argue that pledging the D&PL shares was an investment decision, made at arm's length, in the best interests of MFLP.[9] As to CRFLP, petitioners assert that nothing in the record indicates that decedent pledged any CRFLP asset to secure his personal obligations, noting that decedent had pledged the 80,000 D&PL shares to Morgan Guaranty before he transferred them to CRFLP.

---

[9]Indeed, the resolutions on which petitioners rely claim as much. The first resolution, for example, resolves "that it is in the best interests of * * * [MFLP] for the General Partner to be authorized to pledge Partnership assets as additional security for an existing loan to Roger D. Malkin individually".

3. <u>Analysis</u>

We agree with petitioners as to the interests in the four Malkin LLCs decedent transferred to CRFLP. Nothing in the record suggests that any express or implied agreement gave decedent the right to retain the present economic benefits of those LLC interests.[10] Petitioners fail to convince us, however, with respect to the D&PL stock. We agree with respondent that an implied agreement existed between decedent and the MFLP and CRFLP trustees that decedent would retain the right to use that transferred stock.[11]

Section 20.2036-1(b)(2), Estate Tax Regs., states that a decedent retains "[t]he 'use, possession, right to the income, or other enjoyment of the transferred property' * * * to the extent that the use, possession, right to the income, or other enjoyment is to be applied toward the discharge of a legal obligation of the decedent, or otherwise for his pecuniary benefit." Decedent applied all the D&PL stock he transferred to the FLPs toward the discharge of his legal obligations. He applied the 365,371 D&PL shares he transferred to MFLP toward the discharge of a legal

---

[10]To the contrary, we find that decedent made indirect gifts to his children when he transferred to CRFLP his interests in the four Malkin LLCs. See <u>infra</u> sec. III.D.1. of this report.

[11]Because we find an implied agreement, we do not address whether an express agreement existed that gave decedent the possession of, enjoyment of, or right to income from the transferred stock.

obligation when he and the MFLP trustees pledged those shares to secure his personal loans; he applied the 80,000 D&PL shares he transferred to CRFLP toward the discharge of a legal obligation before he even transferred that stock. See Estate of Bigelow v. Commissioner, 503 F.3d 955, 965 (9th Cir. 2007) ("A key problem with the conveyance of the * * * property to * * * [the family limited partnership] is, for estate tax purposes, that the * * * debt that was secured by the property was not also transferred. This discrepancy indicates that * * * [the family limited partnership] repaid the debt in decedent's stead despite no legal obligation to do so."), affg. T.C. Memo. 2005-65; Stranqi v. Commissioner, 417 F.3d 468, 477 (5th Cir. 2005) ("Certainly, part of the 'possession or enjoyment' of one's assets is the assurance that they will be available to pay various debts and expenses upon one's death."), affg. T.C. Memo. 2003-145.

As to the 365,371 D&PL shares MFLP held, petitioners have failed to show that the decision of decedent, Mr. Hafter, and Ms. Alexander to pledge those shares to secure the personal debts of decedent was a business decision made at arm's length. First, although petitioners offer evidence that, almost 10 months after signing the first guaranty and almost a year after signing the first resolution, decedent transferred $39,140 to MFLP, petitioners offer no evidence that a fee of 0.75 percent was a reasonable fee. See, e.g., Bissey v. Commissioner, T.C. Memo.

1994-540 ("We cannot ascertain whether a price is sufficient if there is no evidence of what an arm's-length price would have been."). Second, petitioners argue that the decision to allow decedent to pledge the D&PL stock to secure his personal debt was in the best interests of MFLP. Yet petitioners do not explain what business purpose of MFLP that decision served. In the absence of any evidence bearing on that purported business decision, we need not, and do not, attach any weight to petitioners' baseless assertions. See Rule 143(b) ("[S]tatements in briefs * * * do not constitute evidence."); see also, e.g., Van Heemst v. Commissioner, T.C. Memo. 1996-305 ("Statements in briefs * * * are not evidence, Rule 143(b), and we do not accept petitioner's assertion without evidence."). We find that decedent retained the right to use the 365,371 D&PL shares he transferred to MFLP.

As to the 80,000 D&PL shares CRFLP held, petitioners argue that nothing in the record indicates that decedent ever pledged any CRFLP assets to secure any personal financial obligation. Yet petitioners concede that decedent had pledged the 80,000 D&PL shares to Morgan Guaranty before he transferred those shares to CRFLP. Petitioners evidently believe that timing is dispositive, but we see no relevant distinction between CRFLP's pledging shares itself and receiving previously pledged shares. See Estate of Bigelow v. Commissioner, supra. In either case, CRFLP

holds property pledged to discharge a personal obligation of decedent. Moreover, petitioners offer no business reason for having CRFLP hold 80,000 D&PL shares pledged to secure decedent's personal debt. We find that decedent retained the right to use the 80,000 D&PL shares he transferred to CRFLP.

### 4. Conclusion

As respondent succinctly argues:

> Decedent's relationship to his * * * [D&PL shares] never changed. He controlled them before and after the transfer to MFLP and CRFLP. The trusts * * * had no role in the affairs of the partnerships. Neither the trustees nor decedent's children objected to his use of the stock to obtain personal loans. Decedent's unrestricted use of * * * [the D&PL shares] suggests that there was an implied agreement that the * * * transferred [D&PL shares] would be available for decedent's use.

For the reasons stated, we find that decedent retained "the possession or enjoyment of" the D&PL shares he transferred to the FLPs within the meaning of section 2036(a)(1).

### D. The Bona Fide Sale Exception

We now consider whether decedent's transfers of D&PL stock nonetheless fall within the section 2036(a) exception for "bona fide" sales for "adequate and full consideration in money or money's worth". We find they do not. Our analysis follows.

### 1. General Rule

In Estate of Bongard v. Commissioner, 124 T.C. 95, 118 (2005), we stated:

> In the context of family limited partnerships, the bona fide sale for adequate and full consideration exception is met where the record establishes the existence of a legitimate and significant nontax reason for creating the family limited partnership, and the transferors received partnership interests proportionate to the value of the property transferred. * * * The objective evidence must indicate that the nontax reason was a significant factor that motivated the partnership's creation. * * * A significant purpose must be an actual motivation, not a theoretical justification.

### 2. Respondent's Argument

Respondent argues simply that, with regard to the D&PL stock, decedent had no legitimate and significant nontax reason for creating either of the FLPs.

### 3. Petitioners' Argument

Petitioners contest respondent's conclusion. Petitioners claim that decedent had many legitimate and significant nontax reasons for creating the FLPs. First, the FLPs allowed decedent "to provide for his children" by "[preserving] the upside potential value of the shares and keep[ing] that growth in his children's hands and not his hands". Second, the FLPs allowed decedent to prevent a sale of D&PL shares, thus protecting D&PL from a sale of shares that would "undoubtedly depress the value of the shares" and avoiding the appearance that decedent was "losing confidence in the upside potential" of the company.

Third, the FLPs allowed decedent "to centralize management of the family's wealth."

### 4. Analysis

We agree with respondent:  With regard to the D&PL stock, decedent had no legitimate and significant nontax reason for creating either of the FLPs.  We address petitioners' arguments in order.[12]

First, petitioners state that decedent created MFLP "to provide for his children."  Although "[l]egitimate nontax purposes are often inextricably interwoven with testamentary objectives", Estate of Bongard v. Commissioner, 124 T.C. at 121, a "'good faith' transfer to a family limited partnership must provide the transferor some potential for benefit other than the potential estate tax advantages that might result from holding assets in the partnership form", Estate of Thompson v. Commissioner, 382 F.3d 367, 383 (3d Cir. 2004), affg. T.C. Memo. 2002-246.

Second, petitioners argue that the FLPs (in particular, MFLP) served a business purpose by preventing a sale of any D&PL

---

[12]Petitioners, in a footnote in their brief, allude to my dissent in Estate of Bongard v. Commissioner, 124 T.C. 95, 141 (2005) (Halpern, J., dissenting).  Petitioners' reliance on that dissent is misplaced, however, as the majority opinion, not any dissent, represents the view of this Court with respect to the issues in Estate of Bongard.  Under the analysis in that dissent, however, the conclusion reached in this case would be no different.

stock. Yet only decedent transferred D&PL stock to the FLPs. The parties have stipulated that Jonathan Malkin owned at least 479,995 D&PL shares, which he pledged as collateral to secure his father's personal debt. Had decedent wanted to prevent the sale of any D&PL stock his family owned, he would have demanded (or at least requested) that his son contribute his own D&PL stock. He did not. Obviously, decedent did not need the FLPs to control his own D&PL stock; he already controlled it.

Third, petitioners argue that decedent created the FLPs to centralize management of the family's wealth--yet decedent contributed all (or almost all[13]) the assets the FLPs held. Because there was no pooling of the family's assets in the FLPs, there was no pooled wealth to manage.[14] See Estate of Strangi v. Commissioner, T.C. Memo. 2003-145 ("Decedent contributed more than 99 percent of the total property * * * and received back an interest the value of which derived almost exclusively from the assets he had just assigned."). The property the FLPs passively held, i.e., the D&PL stock, was simply decedent's wealth. See Estate of Rosen v. Commissioner, T.C. Memo. 2006-115 ("[T]he mere holding of an untraded portfolio of marketable securities weighs

---

[13]Whether decedent or his children made the two $25,000 transfers to the MFLP trusts is unclear and irrelevant.

[14]Melissa Malkin and Jonathan Malkin both had the means to contribute: Petitioners offer evidence that as of Dec. 31, 1999, Melissa Malkin had a net worth of more than $2,300,000, and Jonathan Malkin testified he was worth more than $22 million.

against the finding of a nontax benefit for a transfer of that portfolio to a family entity." (citing Estate of Thompson v. Commissioner, supra at 380)).

### 5. Conclusion

Favorable estate tax treatment was the aim of the change in form. We are unable to identify a legitimate and significant nontax reason for the transfers. See Estate of Thompson v. Commissioner, supra at 380 ("Other than favorable estate tax treatment resulting from the change in form, it is difficult to see what benefit could be derived from holding an untraded portfolio of securities in this family limited partnership with no ongoing business operations."). We find that decedent's transfers of D&PL stock to the FLPs achieved nothing more than testamentary objectives and tax benefits, and thus those transfers do not qualify for the bona fide sale exception in section 2036(a).

### E. Conclusion

We find that decedent retained "the possession or enjoyment of" the D&PL shares he transferred to the FLPs within the meaning of section 2036(a)(1) and that he did not transfer those shares in "bona fide" sales for "adequate and full consideration in money or money's worth".[15] Therefore, under section 2036(a)(1),

---

[15]For that reason, we find that, during his life, decedent did not make indirect gifts to his children of present interests
(continued...)

the value of decedent's gross estate includes the value of the 365,371 D&PL shares he transferred to MFLP and the value of the 80,000 D&PL shares he transferred to CRFLP.

III.  Gift Taxes: 1998, 1999, and 2000

A.  General Rules

Section 2501(a)(1) imposes a tax on the transfer of property by gift.  Under section 2511(a), that gift tax applies "whether the gift is direct or indirect".  See Dickman v. Commissioner, 465 U.S. 330, 334 (1984) ("The language of * * * [sections 2501(a)(1) and 2511(a)] is clear and admits of but one reasonable interpretation:  transfers of property by gift, by whatever means effected, are subject to the federal gift tax. * * * [T]he gift tax was designed to encompass all transfers of property".).

B.  Respondent's Argument

Respondent argues that decedent's gifts to his children of LLC interests and cash and cash equivalents fall into four categories: (1) Indirect gifts involving the interests in the Malkin LLCs decedent transferred to CRFLP; (2) simple cash transfers; (3) cash exchanged for promissory notes, which the

---

[15](...continued)
in those shares.  In sec. III.D.1., infra, of this report, we find that decedent made indirect gifts to his children when he transferred to CRFLP his interests in the Malkin LLCs.  Because we find for respondent with regard to all assets decedent transferred to the FLPs (albeit under two different theories), we do not address respondent's alternative arguments under secs. 2035(a) and 2036(a)(2).

estate listed on Schedule C of its Form 706; and (4) indirect gifts involving additional transfers and payments related to Malkin I and Malkin IV.  First, respondent argues that decedent made indirect gifts of the interests in the Malkin LLCs and not indirect gifts of limited partnership interests.  Second and third, respondent contends that neither the cash transfers nor the purported loans constituted bona fide debt.  Fourth, respondent argues the following were indirect gifts: (1) The 1998 payment of a $64,760 debt of Malkin I; (2) the 2000 payment of a $3,878,409 debt of Malkin I; (3) the 2000 payment of a $370,061 debt of Malkin IV; (4) the 2000 assignment of a promissory note worth approximately $1 million to Malkin IV; and (5) the 2000 payment of $177,795 related to a capital call of Malkin IV.

C.  Petitioners' Argument

Petitioners argue that, because the trusts purchased the limited partnership interests in bona fide sales, no asset decedent transferred to the FLPs was a gift to his children. Petitioners assert that all cash transfers--both those exchanged for promissory notes and those made gratuitously--constituted bona fide debt.  Petitioners declare:  "[T]he evidence presented in these cases is sufficient to establish a true expectation of repayment and intent to enforce collection of these debts."  As to the indirect gifts, petitioners contend that (1) decedent paid those debts for which he was personally liable and (2) not only

was decedent contractually obligated to make the capital contributions, but also every capital contribution he made increased his capital account accordingly.

D. <u>Analysis</u>

We agree with respondent. Petitioners have failed to present evidence sufficient to satisfy their burden with respect to any gift respondent asserts decedent made.

### 1. <u>Decedent's Interests in the Malkin LLCs</u>

Decedent made indirect gifts to his children when he transferred to CRFLP interests in the Malkin LLCs and subsequently transferred to his children's trusts limited partnership interests in CRFLP. The gifts were of the interests in the Malkin LLCs, not of the limited partnership interests.

### a. <u>Indirect Gifts and Shepherd v. Commissioner</u>

The facts here are analogous to those of <u>Shepherd v. Commissioner</u>, 115 T.C. 376 (2000), affd. 283 F.3d 1258 (11th Cir. 2002). In that case, a father (the taxpayer) and his two sons formed a partnership in which the father held a 50-percent partnership interest and each son held a 25-percent partnership interest. <u>Id.</u> at 380. On the same day the father signed the partnership agreement, he executed a deed purporting to transfer real property to the partnership. <u>Id.</u> at 379, 381. The next day, his sons signed the partnership agreement. <u>Id.</u> at 379. We held that, because State law did not recognize a "one-person

partnership", the partnership was valid only after the sons signed the partnership agreement. Id. at 385. For that reason, the deed of land also was not effective until that second day. Id. Because the creation of the partnership preceded the effectiveness of the deed, the sons acquired interests in the real property by virtue of their status as partners of the partnership. Id. at 387. Because the taxpayer's contribution of the property was allocated to his and his sons' capital accounts according to their respective partnership shares, we held that the taxpayer's transfer of real property to the partnership was an indirect gift to each son of an undivided 25-percent interest in that real property. Id. at 389.

The facts here are indistinguishable. On February 29, 2000, decedent and the trustees of the CRFLP trusts signed the CRFLP partnership agreement. That same day decedent (1) transferred his interests in the Malkin LLCs to CRFLP in return for all 100,000 partnership units, and (2) assigned 44,500 CRFLP limited partnership units to each CRFLP trust. On March 1, 2000, decedent established the CRFLP trusts. Because Mississippi State law does not recognize a one-person partnership, CRFLP was valid only after the formation of the trusts. See Miss. Code Ann. sec. 79-14-101(10) (West Supp. 2008) ("'Limited partnership' * * * [means] a partnership formed by two * * * or more persons under the laws of this state".). Only after CRFLP was validly formed

on March 1, 2000, could decedent transfer his interests in the Malkin LLCs to it. Thus, at the time of that transfer, the CRFLP trusts were already limited partners, and they acquired interests in the Malkin LLCs by virtue of their status as limited partners.

There is one difference between these cases and Shepherd. Petitioners argue that the CRFLP trusts purchased the limited partnership interests for their fair market value and thus that decedent made an indirect gift of neither limited partnership interests nor interests in the Malkin LLCs. We disagree with petitioners because we find that decedent's purported sale of limited partnership interests was a sham.

### b. The Sham Sale of CRFLP Partnership Interests

On March 1, 2000, each CRFLP trust entered into a contract with decedent for the purchase of 44,500 CRFLP limited partnership units for $400,500. The terms of the contracts were similar; both called for a downpayment of approximately 10 percent and for a 9-year promissory note, at interest of 6.8 percent, for the balance. About a week after the signing of the contracts, decedent transferred $40,525 to each CRFLP trust. Two days after those transfers, each trust transferred $40,500 to decedent as the 10-percent downpayment for the CRFLP limited partnership units. The CRFLP trusts never paid any interest on the promissory notes; decedent died before the first payment became due, and the estate never made any demand.

Decedent's purported sale of CRFLP limited partnership interests was a sham. At the time decedent and the trusts executed the contracts, decedent was terminally ill.[16] Decedent provided all the money for the 10-percent downpayments; in effect, the notes constituted the only consideration the trusts gave decedent. Both children, however, could have paid a $40,500 downpayment: Petitioners offer evidence that, as of December 31, 1999, Melissa Malkin had a net worth of more than $2,300,000, and Jonathan Malkin testified he was worth more than $22 million. Petitioners do not explain how decedent's actions comported with an arm's-length sale. Moreover, petitioners offer no evidence, beyond the self-serving testimony of decedent's children, that decedent expected the trusts (or his children) to pay the promissory notes. Given that decedent gave his children the money to pay the interest on the MFLP SCINs,[17] we find their testimony as to the CRFLP promissory notes unconvincing. Petitioners offer no explanation for decedent's actions other than his generosity and a donative intent. Those are motivations for a gift, however, not a sale.

---

[16]Indeed, Mr. Ogeka, explaining the reason the CRFLP promissory notes were not SCINs, testified: "[W]e knew that Roger [Malkin] was ill, and * * * [using SCINs] would not [have been] appropriate."

[17]Decedent gave his son the money for both interest payments due on his trust's SCIN and gave his daughter the money for at least one interest payment due on her trust's SCIN.

Petitioners also do not explain the estate's failure to demand payment on the promissory notes. Jonathan Malkin testified that, although he expected his trust to pay the interest and did not expect himself to pay it, he had "sufficient business knowledge" to know that "if the interest isn't paid, the transaction doesn't hold." We agree.

### c. Conclusion

We find that the purported sale of CRFLP limited partnership interests to the CRFLP trusts was a sham and therefore find that Shepherd controls. Because a gift to a trust is a gift to its beneficiary, see Helvering v. Hutchings, 312 U.S. 393, 397-398 (1941), we find that in 2000 decedent made gifts to his children of his interests in the Malkin LLCs.

### 2. The Cash Loans

"A purported loan between family members is always subject to close scrutiny. * * * The presumption, for tax purposes at least, is that a transfer between family members is a gift." Perry v. Commissioner, 92 T.C. 470, 481 (1989), affd. without published opinion 912 F.2d 1466 (5th Cir. 1990).

### a. 1998 and 1999 Purported Loans to Melissa Malkin

In 1998 and 1999, decedent gave his daughter $68,000 and $149,000, respectively. Petitioners attest that those cash transfers were bona fide loans to Melissa Malkin, and that she had every expectation of repaying that indebtedness.

Nevertheless, Melissa Malkin never executed any promissory note with respect to those transfers and, by her own admission, never repaid a dollar of the alleged debt. The only evidence petitioners offer to support their conclusion that those transfers were bona fide loans is Melissa Malkin's testimony that "I offered to pay him back, and he said keep it in the company, you'll need it for operating capital." The "company" was Melissa Malkin's business in Los Angeles representing writers and directors. Yet moments after averring that she offered to repay her father and immediately after confirming that she never in fact repaid any amount, she stated: "[In May 1999,] I closed my company down to be with him, to take care of him." Melissa Malkin did not explain the reason she did not repay her father at that time. Her failure to explain suggests to us that the transfers were not truly for operating capital. We find her testimony unconvincing; we find much more plausible her admission that the 1998 and 1999 transfers were part of decedent's attempts, after almost a decade of estrangement, to reconcile with her. Petitioners have failed to satisfy their burden.

b. 2000 Purported Loans

In 2000, in exchange for promissory notes, decedent gave his son $830,000 and his daughter $100,000. Decedent made two wire transfers to Jonathan Malkin, one for $730,000 and one for $100,000. As to the former, Jonathan Malkin testified that he

did not recall signing the promissory note and that decedent never demanded payment. As to the latter, Jonathan Malkin testified that, as his father's health declined, he and his family were flying "every week to spend time with my father, and he was trying to defray my expenses." As to the $100,000 transfer to Melissa Malkin, she testified that she did not make any payments on the promissory note and did not even recall it.

Other than the promissory notes and the self-serving testimony of Jonathan Malkin and Melissa Malkin, petitioners offer no evidence to support their claim that the transfers were bona fide loans. We need not, and do not, accept that testimony. See Mendes v. Commissioner, 121 T.C. 308, 320 (2003) ("This Court is not bound to accept a taxpayer's self-serving, unverified, and undocumented testimony."). Petitioners have failed to convince us either that Jonathan Malkin and Melissa Malkin intended to repay the transfers or that decedent (or the estate) intended to demand repayment. See, e.g., Estate of Rosen v. Commissioner, T.C. Memo. 2006-115 ("Security, adequately stated interest, and repayment arrangements (or efforts to secure the same) are important proofs of intent, and such proofs are notably lacking here."). Petitioners have failed to satisfy their burden.

c. Conclusion

We find that decedent, in 1998, 1999, and 2000, made cash gifts to Melissa Malkin of $68,000, $149,000, and $100,000,

respectively, and, in 2000, made a cash gift to Jonathan Malkin of $830,000.  As a result, the value of the gross estate should be decreased by the amounts of the promissory notes, and the cash transfers should be reported as gifts on decedent's Forms 709, United States Gift (and Generation-Skipping Transfer) Tax Return, for the years in issue.

### 3.  The Indirect Gifts

#### a.  The Debts of Malkin I and Malkin IV

In 1998 and 2000, decedent paid debts of Malkin I of $64,760 and $3,878,409, respectively, and, in 2000, he paid a $370,061 debt of Malkin IV.  Malkin I and Malkin IV (indeed, all the Malkin LLCs) were Delaware LLCs.  Under Delaware law, although a member of an LLC may agree to be liable for its debts, no member of an LLC is obligated personally for any such debt solely by reason of being a member or acting as a manager of the LLC.  See Del. Code Ann. tit. 6, sec. 18-303 (2005).  Citing the agreements for Malkin I and Malkin IV, petitioners aver that decedent was personally liable for those debts "by virtue of his having made capital commitments to" Malkin I and Malkin IV.  Yet both LLC agreements state that "[n]o Member shall be required to make any Capital Contribution or loans to the Company", other than the payment in full of the initial capital commitment.  Moreover, the evidence belies petitioners' averment; for example, Jonathan Malkin's Schedule K-1, Partner's Share of Income, Credits,

Deductions, etc., of the 1999 Form 1065, U.S. Partnership Return of Income, for Malkin I shows that Jonathan Malkin had a 70-percent share of total liabilities, making his share of the $3,878,409 debt $2,714,886. Petitioners have failed to satisfy their burden; accordingly, we find that decedent made indirect gifts to the beneficial owners of Malkin I and Malkin IV (i.e., his children) when he paid the debts of those LLCs.[18]

b. The Promissory Note and the Capital Contribution

In May 2000, decedent assigned to Malkin IV a promissory note worth approximately $1 million. In September 2000, decedent paid $177,795 to Malkin IV in response to a capital call from Malkin IV. Effective March 1, 2000, however, decedent had transferred his entire interest in Malkin IV to CRFLP, and so he no longer had any interest in Malkin IV at the time of those transfers. A transfer of property to an entity by an unrelated person generally represents a gift to its owners to the extent of their proportionate interests in it. See Kincaid v. United States, 682 F.2d 1220, 1224 (5th Cir. 1982); Tilton v. Commissioner, 88 T.C. 590, 597 (1987) ("Where property is gratuitously transferred by * * * a nonshareholder to a closely held corporation, the transfer is generally an indirect gift to

---

[18]To clarify: When decedent paid the $64,760 debt of Malkin I, he made an indirect gift to his son alone; when decedent paid the other debts, however, he made indirect gifts to both his children.

the shareholders." (internal quotation marks omitted)); sec. 25.2511-1(h)(1), Gift Tax Regs.[19]  Petitioners offer no evidence that the transfer of the promissory note represented anything other than a gift and fail to explain how decedent could be obligated to contribute capital to an LLC of which he was no longer a member.  Petitioners have failed to satisfy their burden; accordingly, we find that decedent made indirect gifts to the beneficial owners of Malkin IV (i.e., his children) when he transferred the promissory note and cash to Malkin IV.

E.  Conclusion

In 2000, decedent made indirect gifts to his children when he transferred to CRFLP his interests in the Malkin LLCs.  In 1998, 1999, and 2000, decedent made direct gifts to his children when he transferred cash to them.  In 1998 and 2000, decedent made indirect gifts to his children when he paid debts of Malkin I and Malkin IV and transferred cash and a promissory note to Malkin IV.

IV.  Deductions of the Estate

With the exception of the deduction for funeral expenses, see supra note 8, respondent has disallowed all deductions of the

---

[19]We note that decedent paid the $3,878,409 debt of Malkin I and the $370,061 debt of Malkin IV, see supra sec. III.D.3.a. of this report, in May 2000, months after decedent had transferred his entire interest in both LLCs to CRFLP.  For that reason, the argument and the authority presented here apply with equal force to decedent's payments of those two debts.

estate. He has done so on the grounds that some expenses have not been paid and that total expenses nonetheless exceed the value of property subject to claims within the meaning of section 2053(c)(2). Respondent objects to only two deductions on the merits. We now discuss those objections and the expenses that respondent asserts have not been paid.

A. Morgan Guaranty Debt

An estate may deduct the value of a claim based on a decedent's promise to pay only if the liability was "contracted bona fide and for an adequate and full consideration in money or money's worth". Sec. 2053(c)(1)(A); see, e.g., Estate of Scholl v. Commissioner, 88 T.C. 1265, 1280 (1987) ("[T]he estate may deduct only that amount which represents a binding legal obligation against the estate."). A taxpayer may not reduce his taxable estate through transactions that are in substance gifts. See, e.g., Estate of Hughes v. Commissioner, T.C. Memo. 2005-296.

With respect to the $12,936,886 debt of decedent to Morgan Guaranty, respondent allowed a deduction of $10,475,066 but disallowed the remainder on the ground that the debt exceeded the value of the collateral securing it.[20] In effect, respondent

_____

[20]Although petitioners allege that respondent first challenged the estate's deduction of the Morgan Guaranty debt in his pretrial memorandum, which might affect who bears the burden of proof on that issue, see Rule 142(a)(1), that is incorrect. In par. (y) of the Explanation of Adjustments, the amended estate tax notice states that "the deduction of $12,936,886 for the

(continued...)

argues that the debt is nonrecourse.  See sec. 20.2053-4, Estate Tax Regs. ("The amounts that may be deducted as claims against a decedent's estate are such only as represent personal obligations of the decedent existing at the time of his death".). Petitioners contend that "the stipulated and uncontroverted evidence shows * * * [the Morgan Guaranty debt] to be a valid and enforceable debt of Decedent", and that respondent "failed to introduce any evidence that * * * [the] debt was anything other than the obligation of the Decedent."  Petitioners miss the point.  Respondent does not deny that the Morgan Guaranty debt was a valid and enforceable debt of decedent; respondent denies only that the debt was enforceable against decedent personally. The several exhibits petitioners cite relating to the debt fail to show that decedent was personally liable for it.  Petitioners have failed to satisfy their burden, and we deny the deduction to the extent the debt was unsecured by collateral.

B.  Malkin IV Capital Contribution

Respondent disallowed the entire deduction with respect to the $2,346,724 claimed obligation of decedent to Malkin IV. Petitioners object, and, citing the agreement governing Malkin IV, argue that decedent was contractually obligated to pay for all 4,999 LLC units to which he initially subscribed.  That

---

[20](...continued)
indebtedness to Morgan Guaranty * * * is limited to $10,475,066, the fair market value of the collateral securing the debt."

agreement, however, suggests the opposite is true.  An Amended Schedule of Units of Membership attached to the agreement shows that as of March 3, 2000, decedent was no longer a member of Malkin IV:  Jonathan Malkin held 1 unit, and CRFLP held 4,999 units.  Petitioners have failed to show that decedent was, at his death, contractually obligated to pay Malkin IV for LLC units to which CRFLP was entitled as decedent's successor-in-interest.[21]

Decedent's will states that if, at decedent's death, "there remains any unfunded capital commitment" of Malkin IV, the estate "shall fund" that "obligation".  Nevertheless, "the will of the decedent cannot be allowed to define what is an 'obligation' or a 'claim'".  United States v. Stapf, 375 U.S. 118, 132 (1963).  Rather, as respondent observes, decedent's "request is indicative of a donative intent."  Petitioners have failed to satisfy their burden, and we deny the deduction.

C.  Executors' Commission, Attorney's Fees, Accounting Fees

Respondent disallowed deductions of $177,421, $200,000, and $200,000 for the executors' commission, attorney's fees, and accounting fees, respectively.  Petitioners offer no evidence

---

[21]Citing the report in which Andersen valued assets of the estate, petitioners observe that Andersen listed the $2,346,724 receivable as an asset of Malkin IV.  To the extent petitioners suggest that decedent was personally liable for the $2,346,724 because "Malkin IV anticipated * * * such capital commitment", we disagree.

that those amounts were paid and, therefore, have failed to prove that the estate is entitled to the claimed deductions.

D. Conclusion

We deny the estate any deduction for (1) the Morgan Guaranty debt above the value of the collateral, (2) the claimed obligation of decedent to Malkin IV, and (3) the executors' commission, attorney's fees, and accounting fees. The sum of all deductions of the estate may not exceed the value of property includable in the estate for Federal estate tax purposes.[22] See sec. 2053(c)(2).

V. Conclusion

In summary, our holdings in these cases are as follows.

(1) Because, within the meaning of section 2036(a)(1), decedent retained for his life the possession and enjoyment of the 365,371 D&PL shares and the 80,000 D&PL shares he transferred to MFLP and CRFLP, respectively, and did not transfer those shares in a bona fide sale for an adequate and full consideration in money or money's worth, the value of decedent's gross estate includes the value of that transferred stock.

(2) In 2000, decedent made gifts to his children of interests in the Malkin LLCs when he transferred to his children's trusts limited partnership interests in CRFLP and transferred to CRFLP interests in those LLCs.

(3) In 1998, decedent made a gift to Jonathan Malkin when he paid a $64,760 debt of Malkin I.

---

[22]Petitioners assert that certain deductions respondent disallowed involve expenses of the estate that petitioners paid on its behalf. The parties have agreed to consider the deductibility of those expenses during the Rule 155 computation.

(4)   In 2000, decedent made gifts to his children when he paid a $3,878,409 debt of Malkin I.

(5)   In 2000, decedent made gifts to his children when, with respect to Malkin IV, he paid a $370,061 debt, made a $177,795 capital contribution, and assigned a promissory note worth approximately $1 million.

(6)   In 1998, 1999, and 2000, decedent made gifts to Melissa Malkin when he transferred to her $68,000, $149,000, and $100,000, respectively.

(7)   In 2000, decedent made a gift to Jonathan Malkin when he transferred to him $830,000.

(8)   The estate assets subject to claims are Form 706 Schedule A real estate of $153,600, Schedule B stocks and bonds of $10,762,398, Schedule C cash of $1,289,579, Schedule D insurance proceeds of $162,500, and Schedule F property of $337,858 plus the value of the 11-percent interest in CRFLP decedent held at his death.[23]

(9)   The estate is entitled to Form 706 Schedule J, Schedule K, and Schedule O deductions of up to $1,338,404, $11,276,832, and $230,925, to the extent the claimed expenses were paid and total deductions do not exceed the value of property in the estate subject to claims.

<u>Decisions will be entered</u>

<u>under Rule 155</u>.

---

[23]During the Rule 155 computation, the parties will need to recalculate the value of decedent's 11-percent interest in CRFLP and to adjust the value of the estate's Schedule F property accordingly.  Because we hold that the 80,000 D&PL shares are sec. 2036(a)(1) property, see <u>supra</u> sec. II.C.3. of this report, the value of that stock is properly included under Schedule G. For that reason, for purposes of valuing decedent's 11-percent interest in CRFLP, CRFLP holds only interests in the Malkin LLCs (the values of which the parties will also need to recalculate in the light of our holdings, see, e.g., <u>supra</u> sec. IV.B. of this report).